81 N.Y.2d 219 (1993)
In the Matter of the Arbitration between Allstate Insurance Company, Petitioner, and Kathleen Stolarz et al., Respondents; New Jersey Manufacturers Insurance Company, Appellant.
Court of Appeals of the State of New York.
Argued February 11, 1993.
Decided May 4, 1993.
Downing & Mehrtens, P. C., New York City (Thomas E. Mehrtens, Alison D. Metzler and John M. Downing of counsel), for appellant.
Michael R. Scolnick, P. C., Pomona (Michael R. Scolnick and Valerie Crown-Goldstein of counsel), for respondents.
Judges SIMONS, TITONE, BELLACOSA and SMITH concur with Chief Judge KAYE; Judge HANCOCK, JR., dissents and votes to affirm in a separate opinion.
*222 Chief Judge KAYE.
In this automobile insurance dispute, both Supreme Court and the Appellate Division concluded that there was a conflict between New York and New Jersey law, and that New York law should control. We conclude there is no such conflict, and in any event New Jersey law applies. Accordingly, we reverse.

I.
On February 18, 1989, Kathleen Stolarz and her husband were injured in a two-car accident on Route 6 in Woodbury, New York. The Stolarz vehicle was a company car leased by her employer, Blue Cross/Blue Shield of New Jersey, and registered in New Jersey. New Jersey Manufacturers Insurance Company (NJM) insured the vehicle under a policy issued to Blue Cross and written to conform to New Jersey law. Stolarz regularly garaged the vehicle at her home in Monroe, New York, a few miles north of the New Jersey border.
The carrier insuring the other vehicle paid the Stolarzes $20,000, the liability limits of its insured's policy. When Allstate Insurance Company, the insurer of the Stolarzes' personal cars, disputed the amount payable under that policy's underinsurance coverage, the Stolarzes served a demand for arbitration and Allstate, in turn, brought a special proceeding in Supreme Court to stay arbitration. NJM, which also disputed the amount payable under its policy's uninsured/underinsured coverage, joined in the proceeding and sought declaratory relief fixing the rights and obligations of the parties. Allstate, having settled with the Stolarzes, is not before us on this appeal.
The NJM policy contains a single limit of uninsurance/underinsurance in the amount of $35,000. In accordance with a New Jersey statute,[1] the policy also provided: "Any amount *223 payable under this [Uninsured and Underinsured Motorists] insurance shall be reduced by all sums paid by or for anyone who is legally responsible." NJM argued that, in accordance with the policy terms and New Jersey law, it was entitled to offset $20,000 (the amount collected by the Stolarzes from the other driver's insurance carrier) from the $35,000 policy limit. The Stolarzes, however, claimed that under New York case law (see, Matter of United Community Ins. Co. v Mucatel, 127 Misc 2d 1045, affd without opn 119 AD2d 1017, affd for reasons stated at Special Term 69 N.Y.2d 777), offset clauses in underinsurance coverage are void, and they demanded $35,000 without reduction.
Relying on Mucatel, Supreme Court determined that there was a conflict between New York and New Jersey law, and under a choice of law analysis concluded that New York law should govern. Accordingly, the court declared that NJM could not take an offset against the policy's stated limit. On NJM's appeal, the Appellate Division agreed with Supreme Court's reasoning and affirmed. We reverse.

II.
The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved. Scrutiny of the alleged conflicting laws in this case reveals that there is no conflict here.
In Mucatel, Supreme Court held that policies containing underinsurance offset provisions are "misleading and ambiguous" because the stated limit of the policy would never be paid in full, the concept of underinsurance presuming that there is at least some insurance (127 Misc 2d, at 1046). This Court affirmed on Supreme Court's reasoning.
The policy in this case contains a single, combined $35,000 limit of uninsurance/underinsurance. Thus the insured, in an accident with a negligent driver, is guaranteed a recovery of $35,000, assuming injuries equal to or greater than that amount. If the other driver is uninsured, the full $35,000 is paid by NJM. To the extent the other driver has insurance, NJM pays the difference up to the "limit" of $35,000.
Mucatel involved strictly an underinsurance clause, whereas here the policy is written with a single limit of un/underinsurance. The distinction is critical. Mucatel's rationale  that the policy's stated limit would never be paid in full  *224 does not apply here because there are circumstances where the stated limit would be fully paid. Accordingly, the provision at issue does not present a similar deception to that identified in Mucatel.
This Court has not previously considered a combined un/underinsurance limit, but any question as to the validity of such provisions should have been laid to rest when the New York Superintendent of Insurance recently promulgated regulations approving single limits and specifically requiring reduction in coverage for amounts recovered from underinsured drivers (11 NYCRR 60-2.1 [c]). Indeed, the regulations were adopted to "eliminate ambiguity [and] minimize confusion" (11 NYCRR 60-2.0 [c]).
The dissent's contention that the regulations should not be given "retroactive effect" and that the Stolarzes' "contractual" rights "vested" at the time of the accident misses the point. We look to the regulations not for their binding effect but for guidance in deciding a legal question that must be answered today: whether offset provisions relating to combined un/underinsurance limits are misleading. The Superintendent of Insurance has determined that such clauses are not misleading, and this is persuasive authority (see, by analogy, Matter of Kransdorf v Board of Educ., 81 N.Y.2d 871, 873).[2]
Similarly, the dissent's argument that the existence of a single limit is immaterial because the offset applies only to the underinsurance component  and that offsets against underinsurance are invariably void under Mucatel  misapprehends the holding of that case. There is nothing inherently objectionable about offsets against the limits of an insurance policy (see, e.g., Matter of Valente v Prudential Prop. & Cas. Ins. Co., 77 N.Y.2d 894, 895-896); indeed they are common. In Mucatel we concluded that the policy was misleading because the insurer would not "ever pay the amount indicated on the *225 policy declaration" (127 Misc 2d, at 1046), and where that is the case Mucatel of course controls. But that situation is not present here. The dissent's attempt to extend Mucatel and make it applicable by artificially splitting the limit of a single clause into separate components is baseless.
Thus, there is no conflict between New York and New Jersey law, and under the law of either jurisdiction, the policy should be construed as written.

III.
Because the dissent and both lower courts conclude that there is a conflict, we next address the choice of law issue to demonstrate that, even in that event, New Jersey law governs.
The historical approaches to choice of law in both tort and contract were rigid and mechanical. In tort cases, courts invariably applied lex loci delicti  the law of the place of the tort  to all substantive issues (see, e.g., Poplar v Bourjois, Inc., 298 N.Y. 62, 66; Restatement of Conflict of Laws §§ 377-390), while contract cases generally invoked the law of the place where the contract was made or was to be performed (see, e.g., Swift & Co. v Bankers Trust Co., 280 N.Y. 135, 141; Union Natl. Bank v Chapman, 169 N.Y. 538, 543). These inflexible rules proved unsatisfactory because the location of the controlling event was sometimes fortuitous, did not reflect the parties' intentions, or was insignificant as against the location of other events. Moreover, the traditional approaches failed to accord any significance to the policies underlying the conflicting laws (see, Cooney v Osgood Mach., 81 N.Y.2d 66, 72).
Auten v Auten (308 N.Y. 155), a contract case, and Babcock v Jackson (12 N.Y.2d 473), a tort action, heralded the modern, more flexible approaches to choice of law. As our jurisprudence has evolved, the preferred analytical tool in tort cases is to apply "interest analysis," where the policies underlying the competing laws are considered (see, Cooney, 81 NY2d, at 72; Schultz v Boy Scouts, 65 N.Y.2d 189, 196-197). Indeed, in a typical tort case  a car accident, for example  strong governmental interests may underlie the choice of law issue. The place where the accident occurred, for example, has an overriding interest in regulating conduct within its borders (Babcock, 12 NY2d, at 483). Similarly, rules distributing the loss after the accident happens may implicate significant governmental interests (see, e.g., Cooney [contribution]; Schultz [charitable immunity]).
*226 By contrast, contract cases often involve only the private economic interests of the parties, and analysis of the public policy underlying the conflicting contract laws may be inappropriate to resolution of the dispute. It may even be difficult to identify the competing "policies" at stake, because the laws may differ only slightly, and evolve through the incremental process of common-law adjudication as a response to the facts presented.
The "center of gravity" or "grouping of contacts" choice of law theory applied in contract cases (see, e.g., Auten v Auten, 308 NY, at 160-161) enables the court to identify which law to apply without entering into the difficult, and sometimes inappropriate, policy thicket. Under this approach, the spectrum of significant contacts  rather than a single possibly fortuitous event  may be considered (see, Restatement [Second] of Conflict of Laws § 188 [2]). Critical to a sound analysis, however, is selecting the contacts that obtain significance in the particular contract dispute. As we have noted, the traditional choice of law factors should be given "heavy weight" in a grouping of contacts analysis (Haag v Barnes, 9 N.Y.2d 554, 560; see also, New Amsterdam Cas. Co. v Stecker, 3 N.Y.2d 1, 5 [emphasizing place of contracting in automobile insurance dispute]; Cooney v Osgood Mach., 81 NY2d, at 74 [using place of the tort, "the traditional choice of law crucible," to resolve impasse when State interests are irreconcilable]).
There are of course instances where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered. For example, in Zeevi & Sons v Grindlays Bank (37 N.Y.2d 220, 227), involving an international letter of credit, we held that New York law should control so that our State would maintain its position as a financial capital of the world. Similarly, in a finder's fee dispute, we applied the New York Statute of Frauds instead of New Jersey law which did not require a written agreement. We took into account the policy of the statute as expressed in its legislative history and observed that application of the statute would contribute to New York's economic development, a strong State interest (see, Intercontinental Planning v Daystrom, Inc., 24 N.Y.2d 372, 382-385).
Automobile insurance, highly regulated as it is, may implicate both the private economic interests of the parties and governmental interests in the enforcement of its regulatory *227 scheme. Thus, we may properly consider State interests to determine whether to apply New York law and void the contract's express terms or apply New Jersey law and enforce the contract as written.
The State interest underlying Mucatel is that consumers purchasing insurance in this State should not be deceived by misleading policy limits. That interest, however, is irrelevant where, as here, the policy is sold in New Jersey by a New Jersey insurance company to a New Jersey insured, and the clause was written to conform to a New Jersey statute. Indeed, while Stolarz (by virtue of her use of the car) is an additional insured under the policy, she is not a party to the contract (see, Burns v Aetna Cas. & Sur. Co., 741 SW2d 318, 322 [Tenn]), nor did she pay the premiums  her New Jersey employer did. Thus, New York has no governmental interest in applying its law to this dispute and New Jersey law must be applied (compare, Matter of Istim, Inc. v Chemical Bank, 78 N.Y.2d 342, 348 ["Because Illinois' policy of requiring notice to judgment debtors is irrelevant, the only relevant policy interest is that of New York in having its attorneys fairly compensated"]).
The same result obtains under a "grouping of contacts" analysis that does not consider State interests. When the significant contacts are considered in light of the reality that this is a contract case, not a tort, it is plain that this dispute overwhelmingly centers on New Jersey. The Restatement, for example, enumerates five generally significant contacts in a contract case: the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties (see, Restatement [Second] of Conflict of Laws § 188 [2]).
Indisputably, New Jersey is the place where the contract was negotiated and made. The parties to the contract are both New Jersey entities. The subject matter of the contract, a vehicle, does not have a fixed location but is registered in New Jersey.[3] Thus, four of the five factors identified in the Restatement *228 plainly point to New Jersey law. (The fifth factor, place of performance, is immaterial here because there is no issue as to performance.)
The dissent's reliance on New York as the situs of the accident and the place where Stolarz (a nonparty to the contract) and the other driver lived confuses the contacts that might be significant in a tort case with those that are material in a contract dispute. In that vein, it is instructive to examine how this and other courts have treated choice of law in automobile insurance cases involving multistate contacts.
In New Amsterdam Cas. Co. v Stecker (3 N.Y.2d 1), a policy was issued in New York to a New York resident. An accident occurred in Connecticut and the insured argued that Connecticut law should apply. The Court flatly rejected the insured's argument that the accident situs, as the supposed "place of performance," should control. Citing Auten, the Court held:
"The error which defendants commit is in assuming that the question here involves performance of a contract. * * * Is the defendant Molly Stecker insured? Has Amsterdam agreed to indemnify her for the loss here anticipated? What was the contract the parties made? What were the rights and obligations which flowed from the document they drew? These are questions, the answers to which are governed solely by the lex loci contractus  New York State" (3 NY2d, at 5).
Similarly, on facts identical to the present case, the Supreme Court of Rhode Island concluded that the situs of the accident and plaintiff's residence were irrelevant (Baker v Hanover Ins. Co., 568 A2d 1023 [RI]). There, in dispute was an uninsured motorist clause contained in a policy issued to a Massachusetts corporation. The car, as here, was leased by the corporation and registered in the corporation's home State. Plaintiff  the corporation's president  lived in Rhode Island and got into an accident there. The court concluded that Massachusetts law must apply: "In the case at bar we are dealing with a policy of insurance executed and delivered in the Commonwealth of Massachusetts to a Massachusetts corporation whose principal place of business is located in South Attleboro, Massachusetts. Consequently the construction of *229 this policy must be determined in accordance with Massachusetts law" (568 A2d, at 1025).[4]
In sum, there is no actual conflict between the law of New York and New Jersey, and in any event New Jersey law would apply here.
Accordingly, the order of the Appellate Division should be reversed, with costs, and judgment granted declaring that only $15,000 of the $35,000 limit provided for in the NJM policy is available to respondents Kathleen and John Stolarz.
HANCOCK, JR., J. (dissenting).
Even though the argument was not advanced in Supreme Court or the Appellate Division, the majority of this Court now concludes that the controlling case of Matter of United Community Ins. Co. v Mucatel (127 Misc 2d 1045, affd without opn 119 AD2d 1017, affd for reasons stated at Special Term 69 N.Y.2d 777) does not apply; that there never was any conflict between New Jersey and New York law; and that the reduction in coverage clause was valid all along in either State. Having thus removed both the controlling New York decision and the conflicts issue from the case, the majority simply enforces the reduction in coverage clause to reduce the Stolarzes' recovery by $20,000. Although holding that no conflicts issue obtains, the majority nevertheless addresses the conflicts point as a hypothetical question and declares the Appellate Division analysis to be in error.
I believe that there was unquestionably a conflict of laws and that the Appellate Division decided the matter correctly using the grouping of contacts approach and properly applied the settled New York Mucatel rule to invalidate the reduction in coverage clause and award the Stolarzes the full liability limit of $35,000. In its holding that Mucatel does not apply, the majority effectively overrules that decision. The result is that the Stolarzes are retroactively deprived of contractual rights to recover the full insurance limits to which they were entitled under the Mucatel rule when the accident happened in February 1989. Because we were not asked to overrule Mucatel and no reason is given for doing so or for depriving the Stolarzes of their rights, I dissent.

*230 I.
The majority offers two bases for its conclusion that under New York as well as New Jersey law the reduction in coverage clause is valid: (1) that because the underinsured coverage and the uninsured coverage are combined in the same endorsement, Mucatel is distinguishable; and (2) that a regulation of the Superintendent of Insurance (11 NYCRR 60-2.1 [c]), while not directly abrogating our holding in Mucatel, nevertheless compels the conclusion that Mucatel does not apply. Neither proposition withstands analysis.
That uninsured and underinsured coverages are combined and offered in one endorsement instead of in two separate endorsements is irrelevant. The form of the endorsement is of no significance. All that matters is the type of insurance triggered by the particular accident  uninsured or underinsured motorist coverage. In this case, two separate and distinct types of insurance coverage[1] are provided in one endorsement to the Stolarzes as insureds to cover two separate and mutually exclusive contingencies: that the insureds are injured by a car that has no insurance or injured by a car that has some insurance, but in an amount less than the declared limit of the insureds' endorsement. But only one kind of coverage per accident can be invoked in a combined uninsured/underinsured endorsement, depending entirely on whether the offending vehicle is covered by some insurance or none. Obviously, an offending vehicle cannot, under the very definitions of the terms in the endorsements, be both uninsured and underinsured at the same time. It must be emphasized that only when the offending vehicle has some insurance and the underinsurance facet of the endorsement is invoked does the reduction in coverage clause  held invalid in Mucatel  operate.
The majority's argument that the mere combining of both coverages in one instrument in some way obviates the effect of the Mucatel holding misses the point of that decision. Here, as *231 in Mucatel, the validity of the reduction in coverage clause, not the endorsement, is in issue. In a claim for underinsurance  in which the reduction in coverage clause operates  the insurer pays only the stated underinsurance limit on the covered vehicle minus the primary liability limit of the other vehicle. The insurer never pays the full underinsurance coverage as stated in the declaration page of the policy.[2] Because of this discrepancy between the stated amount of underinsurance coverage ostensibly provided by the policy and the lesser amount actually recoverable, the Mucatel court held the reduction in coverage clause to be misleading and, therefore, void.
The majority's sole basis for distinguishing Mucatel depends on the fact that uninsured as well as underinsured coverage happens to be combined in one endorsement. It points out that under the New Jersey Manufacturers Insurance Company (NJM) endorsement when the insured is injured by a vehicle with no insurance, the insured will be paid the full amount of coverage provided in the endorsement. Thus, the argument goes, the significant aspect of the Mucatel holding  that the full amount of the coverage under the endorsement will never be paid  does not pertain. The majority's effort to distinguish Mucatel is ineffectual, however, because the only circumstance when the full liability limits can be recovered is when the uninsured  not the underinsured  coverage is invoked. Then, of course, the reduction in coverage clause, held void in Mucatel, does not apply at all.
The majority's argument, simply stated, is that because the endorsement provides parallel uninsured coverage, which is not affected by the void reduction in coverage clause, the reduction in coverage clause somehow becomes valid when applied to underinsurance. The fallacy in the majority's proffered distinction is clearly illustrated when the present case is taken as an example. If the Stolarzes' underinsurance coverage had been provided in a single endorsement, the reduction in coverage clause would have been held invalid under Mucatel *232 and they would have received the full amount, $35,000. But because uninsured coverage was also provided in the same endorsement and the Stolarzes might have recovered the full $35,000 of uninsured coverage had they been injured by a car with no insurance, the reduction in coverage clause becomes valid and the $20,000 James settlement is deducted from the Stolarzes' $35,000 of underinsurance. If there is any plausible reason for reaching these diametrically opposite results merely because the two types of coverage are provided on the same page, the majority does not explain it.
The majority offers a second basis for its proposition that the reduction in coverage clause is valid under New York as well as New Jersey law and that, therefore, the case presents no conflict of laws issue: that a regulation of the Superintendent of Insurance adopted in July 1992 (11 NYCRR 60-2.1 [c]), more than three years after the accident, somehow abrogates or modifies the Mucatel holding. To be sure, NJM does not argue, and the majority purportedly does not hold, that the Superintendent's regulation should be given retrospective effect in overruling a decision of this Court and thus retroactively depriving the Stolarzes, as insureds, of contractual rights to the full coverage amount vested in February 1989. In Mucatel our Court established a rule of contract law: reduction in coverage clauses because of the way they operate on underinsurance provisions are, as a matter of New York law, void. The majority apparently concedes that the Superintendent of Insurance has no authority to overrule a decision of this Court in contract law, a field embedded in common law which is uniquely within the province of the courts. Certainly, the Superintendent could not do so retroactively (see, 4 Davis, Administrative Law Treatise § 20:7 [estoppel from retroactive lawmaking] [2d ed]; Matter of CNA Ins. Cos. [Grandstaff], 188 AD2d 965 [relying on Mucatel's holding after 11 NYCRR 60-2.1 (c) went into effect to conclude that reduction in coverage clauses were void]).
Nevertheless, the majority gives what amounts to retroactive effect to the Superintendent's regulation. It does so not by treating the regulation as overruling Mucatel but by concluding that "[t]he Superintendent of Insurance has determined that such clauses [held misleading by this Court in Mucatel] are not misleading, and this is persuasive authority" (majority opn, at 224 [emphasis added]). The majority does not explain how it can adopt the Insurance Superintendent's ruling as "persuasive authority" (id.) on the legal question of whether *233 reduction in coverage clauses are void in New York in lieu of a directly contrary decision of the New York Court of Appeals on the same question without overruling that decision. The majority's citation of Matter of Kransdorf v Board of Educ. (81 N.Y.2d 871) is equally puzzling. In Kransdorf we gave due deference to a decision of the Commissioner of Education on a question of interpretation of the Education Law. Here, of course, the issue does not involve statutory interpretation but the application of a clearly stated rule of New York common law enunciated by our Court to the effect that reduction in coverage clauses are void as misleading.
Both before and after Mucatel, New York courts have ruled that reduction in coverage clauses are void and unenforceable (see, Matter of Federal Ins. Co. v Reingold, 181 AD2d 769, 771; Garry v Worldwide Underwriters Ins. Co., 120 Misc 2d 91, 93, affd 101 AD2d 717; Passaro v Metropolitan Prop. & Liab. Ins. Co., 128 Misc 2d 21, affd on opn below 124 AD2d 647; see especially, Matter of CNA Ins. Cos. [Grandstaff], 188 AD2d 965, supra [relying on Mucatel's holding after the effective date of the insurance regulation 11 NYCRR 60-2.1 (c) to conclude that reduction in coverage clauses were void]). There are no cases to the contrary. The practical result of today's decision  that Mucatel does not apply because the endorsement includes both uninsurance and underinsurance and because of the "persuasive authority" of the Superintendent's recently adopted regulation  can be nothing other than the sub silentio overruling of Mucatel.

II.
Because the majority's reversal is based on its conclusion that there is no conflict of laws here, an extensive discussion of that issue is not necessary. I believe the unanimous Third Department was unquestionably correct in holding that under a grouping a contacts analysis New York law was the proper choice. The conflict between New York and New Jersey law arises from NJM's insistence that the reduction in coverage clause can be enforced in New York in the face of this Court's ruling that such a clause is void under New York law. Since this is an issue of contract enforcement between the Stolarzes as insureds and NJM  turning only on whether New York decisional law (i.e., Mucatel) should be given effect to invalidate the reduction in coverage clause  a grouping of contacts analysis demonstrates, on established authority, that New *234 York law should apply (see, e.g., Auten v Auten, 308 N.Y. 155, 160; Intercontinental Planning v Daystrom, Inc., 24 N.Y.2d 372, 382-383 [holding New York law the proper choice in dispute over enforcement of contract made in New Jersey and invalidating contract under the New York Statute of Frauds]; Babcock v Jackson, 12 N.Y.2d 473, 481; Colonial Penn Ins. Co. v Minkoff, 40 AD2d 819, affd 33 N.Y.2d 542; Borg-Warner Corp. v Insurance Co., 174 AD2d 24, 29).
The majority, while ostensibly agreeing with the Appellate Division's use of a grouping of contacts, appears to apply the traditional and outmoded lex loci contractus and, relying on New Amsterdam Cas. Co. v Stecker (3 N.Y.2d 1), concludes that the law of New Jersey, not New York, is the proper choice. But this conclusion is based on a mistaken premise: that the dispute involves a question of contract interpretation between NJM and Kathleen Stolarz' employer, Blue Cross. Neither Blue Cross nor the owner/lessor of the company car used by Kathleen Stolarz is a party to this proceeding. Neither has any apparent interest in the outcome of the dispute. Nor is there any question about what the reduction in coverage clause, or the underinsured motorist endorsement, or any other provision of the policy means. The dispute is exclusively between the Stolarzes, both of whom are insureds under the NJM policy, and NJM. The sole question is whether New York case law should be given effect to invalidate the reduction in coverage clause or whether that clause should be enforced against them despite New York's declared interest in protecting its residents from the harmful effect of the clause it has declared void.
Because the issue is one of contract enforcement, not a dispute between the contracting parties pertaining to its interpretation, the place where the contract was made is of relatively little significance in a grouping of contacts analysis (see, Auten, supra, at 160; Restatement [Second] of Conflict of Laws § 188, comment e). The contact of prime significance  one not even alluded to by the majority  is the location of the risk insured against: the place where an accident triggering the underinsured motorist coverage of the NJM policy would most likely occur (see, Colonial Penn Ins. Co. v Minkoff, supra, at 819 [grouping of contacts "rule requires courts to apply the law of the State which the parties understood would be the principal location of the insured risk" (id.)]; Borg-Warner Corp. v Insurance Co., supra, at 29 [in a conflict of laws question involving the pollution exclusion clause in an insurance policy, *235 weight given in choosing New York law to New York as the place of greatest insurance risk because 7 of the 19 hazardous waste sites at issue were located there]; Wille v Farm Bur. Mut. Ins. Co., 432 NW2d 784 [Minn Ct App] [in applying Minnesota law to void the antistacking provision in an Iowa underinsured motorist endorsement, the court stated: "the (insurance) company knows the automobile is a movable item * * * driven from state to state * * * (and) therefore, accepts the risk that the insured may be subject to liability not only in the state where the policy is written" (id., at 786)]; Glowski v Allstate Ins. Co., 134 NH 196, 589 A2d 593 [in applying law of insured's residence and of principal location of the risk in dispute concerning uninsured/underinsured coverage, court stated: "(p)articularly in the context of insurance contracts, we have found that the State which is the `principal location of the insured risk' bears the most significant relationship to the contract, in the absence of an express choice of law by the parties" (id., 134 NH, at 198, 589 A2d, at 595)]).
Here, the principal location of the insured risk was in New York. Kathleen and John Stolarz lived in New York. The company car was garaged at their residence in New York. Certainly, NJM was charged with knowledge that Blue Cross had entrusted the car to its employee, Kathleen Stolarz, for use in New York and that there was a likelihood that any accident involving the car would occur in New York. Ultimately, of course, the accident triggering the Stolarzes' claims did happen in New York. Significantly, Insurance Law § 3420 (h) defines the term "risk located in the state" as including "any vehicle which is principally garaged or principally used in this state" (emphasis added). The only place where the company car was garaged was in New York. That fact alone locates the risk in New York. The company car was principally used in New York. And, that fact, too, is enough to place the risk in New York. The majority, however, without explanation, simply ignores the location of the risk in New York as a contact of major significance. In failing to address the issue as one of enforcing the Stolarzes' rights to invalidate the reduction in coverage clause and treating this case instead under a lex loci contractus analysis as though it involved some undefined question of interpretation between NJM and Blue Cross, the majority avoids mention of Insurance Law § 3420 (h) and Colonial Penn Ins. Co. v Minkoff (supra), and the other cases emphasizing the primary importance of the place of risk.
Moreover, there are other New York contacts. The accident *236 involved another car driven by a New York resident insured in New York. The dispute over the enforceability of the reduction in coverage clause arose in a New York litigation which originally involved Allstate's coverage under another automobile insurance policy issued in New York to the Stolarzes. In view of the Stolarzes' New York residence and New York's obvious interest in assuring that its law is applied to protect New York residents in contract enforcement issues (see, Auten, supra, at 162; Daystrom, supra, at 387-388; Borg-Warner, supra, at 29; Restatement [Second] of Conflict of Laws § 188, comment e) the Appellate Division properly concluded that New York was the place "most intimately concerned with the outcome of the case at issue" (Matter of Allstate Ins. Co. [Stolarz  N. J. Mfrs. Ins. Co.], 178 AD2d 899, 900).
The majority's reliance upon Stecker (supra) is misplaced. Unlike the case here, Stecker did not involve a question of contract enforcement but a question of contract interpretation and whether there was any coverage at all under a New York insurance policy incorporating the 1937 amendments to the predecessor to New York Insurance Law § 167 (3), which excluded coverage when one spouse sued another for bodily injuries resulting from an automobile accident. The Court reached its result not by applying a grouping of contacts analysis but by relying on the outmoded and less flexible lex loci contractus rule embraced in the Restatement (First) of Conflict of Laws § 332 (see, Stecker, supra, at 5). While the basis of the Stecker Court's decision was lex loci contractus, the Court's opinion emphasized that the application of New York law at that time furthered the then existing and now outmoded New York interest in totally prohibiting interspousal insurance coverage so as to protect insurers from allegedly collusive litigation (see, Stecker, supra, at 6-8). By the same token the Appellate Division's application of New York law under a grouping of contacts analysis similarly furthers an important interest of New York  protecting New York insureds from the adverse effects of void reduction in coverage clauses as explained in Mucatel (supra).
I respectfully dissent and would affirm the order of the Appellate Division.
Order reversed, etc.
NOTES
[1] New Jersey Statutes Annotated § 17:28-1.1 (e) (1) provides: "The limits of underinsured motorist coverage available to an injured person shall be reduced by the amount he [or she] has recovered under all bodily injury liability insurance or bonds."
[2] The dissent relies on Matter of CNA Ins. Cos. (Grandstaff) (188 AD2d 965) in support of its argument that, even after promulgation of the Superintendent's regulations, all offset clauses are void. That case, however, did not involve a combined un/underinsurance clause but, like Mucatel, strictly underinsurance. Indeed, the court stated that the "relevant language in the face sheet and policy endorsement appears to be identical to that contained in [Mucatel]" (188 AD2d, at 967). The court did not even refer to the regulations.

Similarly, the dissent's view that Mucatel created "contractual" rights is unsupportable. The effect of Mucatel, where applicable, is to abrogate the contractual language agreed upon by the parties.
[3] The dissent's contention that the vehicle was principally used in New York is without evidentiary support in the record. Indeed, it is more logical to assume that the car was primarily used in New Jersey in connection with the business of Blue Cross/Blue Shield of New Jersey, or even if used primarily for commuting, that the bulk of Stolarz's commute occurred in New Jersey. If the car were garaged and principally used in this State (as assumed by the dissent) it might well be that New York registration would be required (see, e.g., Vehicle and Traffic Law § 250 [1]).
[4] Without belaboring the point, many other cases reject the sort of contacts the dissent relies upon (see, e.g., Burns v Aetna Cas. & Sur. Co., 741 SW2d 318 [Tenn], supra; Davis v State Farm Mut. Auto. Ins. Co., 264 Ore 547, 507 P2d 9, 10; Nadler v Liberty Mut. Fire Ins. Co., 424 SE2d 256, 262 [W Va]; State Farm Mut. Auto. Ins. Co. v Estate of Simmons, 84 NJ 28, 417 A2d 488).
[1] That the uninsured and underinsured coverages are separate and distinct is apparent from the mutually exclusive definitions of these terms in the endorsement and also from the provisions of the controlling New Jersey statute, which states: "Underinsured motorist coverage shall not apply to an uninsured motor vehicle" (NJ Stat Annot § 17:28-1.1 [e] [1]). "`Uninsured motor vehicle' shall not include an underinsured motor vehicle" (id., § 17:28-1.1 [e] [2]). Also, New York law distinguished uninsured motorist coverage from underinsured motorist coverage (see, Insurance Law § 3420 [f] [1], [2]).
[2] As the Mucatel court explained, for a policy having an underinsured coverage in the declared amount of $25,000, the "insurer will not pay the amount stated on the face of the declaration but only $15,000 (for a New York insured vehicle) and $10,000 (for a New Jersey insured vehicle). In no event, irrespective of the State of registration of the offending vehicle, will the carrier providing the underinsured coverage ever pay the amount indicated on the policy declaration. This is both misleading and ambiguous" (Mucatel, supra, at 1046).